Oshonya SPENCER, Charles Strickland, and Douglas McDuffie, on behalf of themselves and others similarly situated, Plaintiffs,

v.

The HARTFORD FINANCIAL SERVICES GROUP, INC., Hartford Life, Inc., Hartford Life Insurance Company, Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Insurance Company of the Midwest, and Hartford Fire Insurance Company, Defendants.

Civil Action No. 3:05–cv–1681 (JCH).

United States District Court,
D. Connecticut.

March 10, 2009.

286

Carl S. Kravitz, Ellen D. Marcus, Zucker-
man Spaeder LLP, Washington, DC, David
S. Golub, Jonathan M. Levine, Silver, Golub

& Teitell, Stamford, CT, Peter R. Kahana, Steven L. Bloch, Berger & Montague, Philadelphia, PA, Richard B. Risk, Jr., Risk Law Firm, Tulsa, OK, for Plaintiffs.

Charles E. Tebbe, Rachel M. Wertheimer, Morrison & Foerster, New York, NY, Jonathan M. Freiman, Wiggin & Dana, New Haven, CT, Robert S. Hoff, James H. Bicks, Wiggin & Dana, Stamford, CT, Robert M.

Langer, Seth L. Huttner, Wiggin & Dana, Hartford, CT, for Defendants.

**RULING RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL (DOC. NO. 121)**

JANET C. HALL, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ...............................................287

II. FACTUAL BACKGROUND ........................................288

III. STANDARD OF REVIEW .......................................288

IV. DISCUSSION...................................................289
   A. Subclasses .................................................289
   B. Numerosity.................................................289
   C. Commonality ..............................................290
   D. Typicality .................................................291
   E. Adequacy of Representation ................................292
      1. Parties .................................................292
   F. Predominance of Common Issues Over Individual Issues .....294
      1. RICO Claim .............................................295
         a. Violation of RICO Statute...........................295
            i. Conduct .......................................295
            ii. Enterprise .....................................295
            iii. Pattern .......................................296
            iv. Racketeering Activity ..........................296
            v. Interstate Commerce ...........................297
         b. Injury to Business or Property Caused by RICO Violation .........297
      2. State Law Claims .......................................298
         a. Fraud .............................................299
         b. Breach of Contract .................................303
         c. Unjust Enrichment .................................304
      3. Damages ...............................................305
   G. Superiority of Class Action ................................306
      1. Class Members' Interest in Bringing Separate Actions .................306
      2. The Nature and Extent of Existing Litigation .........................306
      3. The Desirability of Concentrating the Litigation in this Forum .........306
      4. Management Difficulties ................................307
   H. Ascertainability of Class .................................307
   I. Time Period .............................................307

V. CONCLUSION................................................308

## I. INTRODUCTION

The plaintiffs, Oshonya Spencer, Charles Strickland, and Douglas McDuffie, filed this putative class action on October 31, 2005, against defendants The Hartford Financial Services Group, Inc., Hartford Life, Inc., Hartford Life Insurance Company, Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Insurance Company of the Midwest, and Hart-

ford Fire Insurance Company. Plaintiffs assert a federal claim under RICO and state law claims for fraud, breach of contract, and unjust enrichment. In an oral ruling on October 24, 2006, the court denied defendants' Motion to Dismiss. Plaintiffs moved for class certification on February 6, 2008, and simultaneously sought to file a proposed Second Amended Complaint. Following additional submissions, the court granted plain-

tiffs leave to amend their complaint (Doc. No. 169), and plaintiffs filed a Revised Second Amended Complaint on May 13, 2008 (Doc No. 172). After the Motion to Certify was joined, oral argument was held. Plaintiffs' Motion to Certify the Class and Appoint Class Counsel is now pending before this court.

In their Revised Second Amended Complaint, plaintiffs requested the court to certify as a class:

> All persons who entered into a settlement with any of The Hartford Property & Casualty Companies between 1997 and the present in which some or all of the settlement amount was to be paid as a structured settlement funded with an annuity from one of The Hartford Life Companies, who had a written contract specifying, or before entering into the written contract had received a written representation as to, the total or present value of the settlement or portion of the settlement being structured or the amount to be used to fund the structure. Excluded from this class are persons who were represented by a plaintiffs' broker in connection with the settlement.

Pls.' Rev. Second Am. Compl. at ¶ 51. In their Reply, plaintiffs acknowledge that the court may wish to make use of subclasses, and they propose subclasses defined by each of the four causes of action: RICO, breach of contract, fraud, and unjust enrichment. Pls.' Reply in Further Supp. of Mot. for Class Certification at 4 ("Pls.' Reply").

## II. FACTUAL BACKGROUND

Plaintiffs, and the class they seek to represent, entered into agreements with one or more of the defendants to settle claims against those defendants' insureds. Each of these settlements included a "structured" portion, that is, an agreement by the insurer to make one or more future payments to the claimants, typically in addition to an up-front lump sum payment. Structured settlements are commonly used in the insurance industry, as they provide income security to claimants, and tax and financial benefits to claimants and insurers alike.

During the period of time at issue, certain defendants, who are property and casualty insurers, funded these settlements through the purchase of annuities from other defendants, affiliated life insurance companies authorized to sell annuities. Plaintiffs allege that defendants engaged in the fraudulent practice of systematically retaining a portion of the amount that was supposed to be structured, so that the amount a plaintiff received was ultimately less than the amount for which he or she had settled. Defendants do not dispute that commissions and other fees were deducted from the amounts structured, but counter that these deductions were simply to cover routine costs associated with the production of a product. Like any other product, defendants argue, marketing, salaries, overhead, taxes, other costs, and profit are factored into the price. Furthermore, defendants contend, plaintiffs' settlement agreements provide for a stream of payments; as plaintiffs have received the promised stream consistent with their settlements, they should have no complaint.

Plaintiffs dispute defendants' characterization of the transactions at issue. Plaintiffs argue that defendants did not sell plaintiffs a product, but rather bought a release of plaintiffs' claims. The transactions should not, plaintiffs contend, be compared to a consumer purchasing an annuity because, unlike in the consumer context, an insurance company honoring a contractual obligation to pay coverage does not have the right to profit or to reimbursement of expenses incurred in making that payment. Oral Arg. Tr. at 4–6.

## III. STANDARD OF REVIEW

To maintain a class action, a plaintiff must establish the four prerequisites of every class action found in Federal Rule of Civil Procedure 23(a) and satisfy at least one of the prerequisites found in Rule 23(b). *See* Fed. R.Civ.P. 23(a) and 23(b). Under Rule 23(a), a proposed class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*Id.* at (a). These prerequisites are usually known as "numerosity, commonality, typicality, and adequacy of representation." *In re Initial Public Offerings Securities Litigation,* 471 F.3d 24, 33 (2d Cir.2006) [hereinafter *"In re IPO"*]. Plaintiffs seek certification under the provisions of Rule 23(b)(3). *See* Pls.' Mem. in Supp. of Mot. for Class Certification at 3. To certify a class under Rule 23(b)(3), the court must determine "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). These are known as the "predominance" and "superiority" requirements.

In *In re IPO,* the Second Circuit defined the standard that district courts are to use in deciding whether a plaintiff has met his or her burden under Rule 23. 471 F.3d at 41. A "district court may not grant class certification without making a determination that all of the Rule 23 requirements are met." *Id.* at 40. These determinations "can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met." *Id.* at 41. "The obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement." *Id.*

"[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir. 2008). A court must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *In re IPO,* 471 F.3d at 41.

## IV. DISCUSSION

### A. *Subclasses*

Class actions are a means of adjudicating similar claims of many plaintiffs together. The Rule 23 requirements must be satisfied in order to ensure that a class action is a fair and efficient means of adjudicating the conflict between the parties. Because class actions involve standardized proof, if the claims of some class members vary too extensively from the claims of others, then joining those members together in one class would not be appropriate.

Plaintiffs seek to include in their class all individuals who received a written representation as to "the total or present value of the settlement or portion of the settlement being structured or the amount to be used to fund the structure." Pls.' Rev. Second Am. Compl. at ¶ 51. As defendants point out, written representations provided to plaintiffs vary in how they refer to the total dollar amount being structured. Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class Certification at 24 ("Defs.' Opp'n"). Examining only settlement agreements, defendants point out that terms used to refer to the structured amount include: future payments "having a present value" of $x$, $x$ to be "placed in" an annuity, "stated purchase price" of annuity is $x$, "total cost to provide above benefit" is $x$, and "present day cost of settlement" is $x$, where $x$ is the total dollar amount at issue. *Id.*

The court determines that claims of class members who received written representations making an explicit or implicit reference to "value" sufficiently differ from claims of class members who received written representations making an explicit or implicit reference to "cost" that they should not be in a single class together. "Cost" and "value" are not synonymous; "cost" suggests the amount of money one must pay to obtain a desired good, while "value" suggests the worth of a good one holds or receives irrespective of the amount paid to obtain it. Therefore, in determining whether the Rule 23 requirements have been met, the court will treat separately plaintiffs who received a representation of "cost," and those who received a representation of "value."

### B. *Numerosity*

Rule 23(a)(1) requires that a class be so numerous that joinder of all members

is impracticable. To establish numerosity, plaintiffs are not required to show "evidence of exact class size or identity of class members." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993). Joinder need not be impossible, nor is there a pre-set numerical threshold for determining "numerosity." Rather, the court must look at the class as a whole and assess if "the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229, 244–45 (2d Cir.2007).

■ Plaintiffs contend that, after discovery, approximately 9,850 members of the class exist (through statistical determinations). In their Reply, plaintiffs propose subclasses consisting of 9,431 members (RICO and fraud claims), 7,206 members (unjust enrichment claims), and 2,645 members (breach of contract claims). They add that joinder is impracticable because the class is geographically dispersed across the United States. Finally, they contend that the "damages suffered by each individual claimant" make individual suits not feasible.[1]

Defendants concede that plaintiffs have satisfied the numerosity requirement.[2] Defs.' Opp'n at 26. Even after separating the classes into "cost" and "value" groups, the court determines that there are a sufficiently large number of class members in each proposed subclass to make joinder impracticable, and that the proposed class and subclasses therefore meet the numerosity requirement of Rule 23(a)(1).

### C. Commonality

■ Rule 23(a)(2) requires that there be questions of law or fact common to the class. "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997) (citation omitted). But "[i]t does not require that all questions of law or fact raised be common." *Reese v. Arrow Financial Services, LLC*, 202

F.R.D. 83, 91 (D.Conn.2001) (internal citations omitted). Rather, Rule 23(a)(2) requires only that common questions exist "at the core of the cause of action alleged." *Reese*, 202 F.R.D. at 91. Where the question of law involves "standardized conduct of the defendant towards members of the proposed class ... the commonality requirement of Rule 23(a)(2) is usually met." *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D.Ill. 1984).

Plaintiffs contend that several factual and legal issues are common to the class. They contend that defendants employed uniform policies and practices resulting in similar harms to each class member, and in particular engaged in uniform, materially false and deceptive representations that the amount allocated to purchase an annuity would equal the disclosed cost or value. They allege that defendants uniformly deducted undisclosed fees and commissions from the settlement amount to be structured, resulting in each plaintiff receiving only 85% of the agreed-upon settlement amount that was supposedly structured for his or her benefit. Finally, they contend that the legal questions of whether defendants violated RICO, breached its settlement agreements, committed fraud, or were unjustly enriched are the same for each class member.

Defendants do not extensively contest the question of commonality, but argue that commonality is not satisfied because, while the questions at stake may be the same for each class member, the answers to those questions vary.

■ The court determines that at least one common question of law or fact exists at the core of this case, namely the question of whether defendants' alleged practice of deducting fees from the amounts structured violates RICO, or constitutes fraud, breach of contract, or unjust enrichment. For the purposes of class certification, the court need not resolve *whether* defendants' alleged practices took place or inflicted an actionable injury upon the plaintiffs. While the court must

---

1. Plaintiffs calculate the typical recovery to be approximately $7,500 per individual plaintiff. Oral Arg. Tr. at 21.

2. At Oral Argument, defendants stated that they would dispute numerosity if the class definition was "slice[d]" down into "many" subclasses. Oral Arg. Tr. at 73.

consider as part of the "predominance" inquiry whether the variance in disclosures to plaintiffs is sufficient to defeat class certification, the court determines that once separated into "cost" and "value" subclasses, the conduct at the core of this case—defendants' practice of deducting fees from settlement amounts to be structured—was sufficiently standardized to permit a determination of commonality. "A lack of identical factual situations will not necessarily preclude certification where the class representative has shown sufficient common questions of law among the claims of the class members." *Franklin*, 102 F.R.D. at 949. Plaintiffs have established by a preponderance of the evidence that common questions exist at the core of their action. The court therefore determines that plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

### D. *Typicality*

■ Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The requirement is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376 (citation omitted).

Plaintiffs claim that each member of the proposed class has claims that arise from the same conduct of defendants, and that they are making the same legal arguments to prove defendants' liability. Plaintiffs contend that each and every plaintiff need not assert each and every legal theory. They argue that individually and collectively, the three named plaintiffs are typical of members of each of the various proposed subclasses.

Defendants dispute typicality, arguing that Strickland's agreement contained no promise of an annuity, and Spencer and McDuffie's agreements do not describe the cost or value of an annuity, making them not typical of claimants whose agreements make a representation of cost or value. Defendants also contend that the lack of a standardized form and the use of a wide variety of settlement agreement types precludes a finding of typicality.

In *Marisol A.*, the Second Circuit considered the question of whether a class could be certified when each named plaintiff challenged a different aspect of New York City's child welfare system and no single plaintiff was "affected by each and every legal violation alleged in the complaint." *Id.* at 377. It affirmed the district court's certification and findings that the various provisions reflected "a single scheme for the delivery of child welfare services" and reflected a "pattern of behavior that commonly affects all of the proposed class members." *Id.* Though it required the use of subclasses, the Second Circuit held that, where plaintiffs had alleged "that their injuries derive from a unitary course of conduct by a single system," certification was appropriate. *Id.*

■ Similarly, plaintiffs here have alleged a common course of conduct by defendants that affects all plaintiffs in a similar manner. The alleged misrepresentation occurred in one of several ways. Some class members received a quote sheet. Some class members, like Spencer and McDuffie, had settlement agreements that represented an annuity, but the total dollar amount to be structured was disclosed in a pre-agreement representation of cost or value rather than being disclosed in the agreement itself. Other class members, like Strickland, had settlement agreements that represented the total cost or value of the settlement in addition to the periodic payments to be received. Plaintiffs have included in the class only those class members who received a written representation as to the total dollar amount being structured. The court has divided the proposed class into two categories—those who received an explicit or implicit representation of "cost," and those who received an explicit or implicit representation of "value." Although the language in agreements and other written representations varies, they refer to a total amount structured in one of a finite number of ways.

The named plaintiffs have claims typical of the various proposed subclasses. Spencer's attorney was sent a pre-agreement letter representing the "cost" of the annuity. Appendix to Pls.' Mem. in Supp. of Mot. for Class Certification, at APP113 ("Pls.' App.").

Strickland's settlement agreement provided for a "present value" of "future periodic payments" as well as a "total settlement present value." *Id.* at APP128. Finally, McDuffie's representative was sent a letter offering to settle for the policy limit of $50,000. *Id.* at APP121. His settlement agreement provided for him to receive $13,231.18 up-front; by deduction, the remaining value of $36,768.82 was structured. *Id.* at APP123; *see also id.* at APP122 (quote sheet provided by Hartford in discovery showing an annuity with a "Gross Premium" of $36,768.82). Spencer's claims are similar to those of class members who received an implicit or explicit representation of cost, and Strickland and McDuffie's claims are similar to those of class members who received an implicit or explicit representation of value. Spencer on the one hand, and Strickland and McDuffie on the other, have claims sufficiently similar to those of their fellow subclass members that, under *Marisol A.,* the named plaintiffs satisfy the typicality requirement of Rule 23(a)(3).

### E. *Adequacy of Representation*

■ Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class." The court must consider "whether (1) the plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 99 (2d Cir.2007) (citation omitted).

### 1. *Parties*

The Rule 23(a)(4) analysis "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). "To have standing to sue as a class representative it is essential that a plaintiff ... be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Cordes & Co.,* 502 F.3d at 99 (citations omitted). However, some conflict is permissible; "[t]he conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamen-

tal...." *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 145 (2d Cir.2001).

Defendants contest adequacy on two grounds. First, drawing upon a statement in plaintiffs' brief that plaintiffs could prove their case even under the laws of the strictest state, defendants counter that plaintiffs cannot accede to the most stringent standards without rendering themselves inadequate representatives of those class members from jurisdictions with an easier-to-satisfy standard for recovery. Second, defendants argue that inter-class conflict exists because class members whose settlement agreements do not contain a representation of cost or value will be advantaged by the inclusion of extra-contractual evidence, while those with a representation of cost or value will be disadvantaged by the inclusion of such evidence (because defendants could then introduce extra-contractual evidence contradicting plaintiffs' claims).

Plaintiffs claim that they have no antagonistic interests and that they are an "enthusiastic and representative sample" with "thoroughly aligned" interests, citing deposition testimony of all three named plaintiffs as to their enthusiasm and interests. In response to defendants' specific allegations, plaintiffs counter that there is no risk of inter-class conflict because the differences are not material. They explain that they would not subject the entire class to success on the strictest standard, but just that there is no conflict because the same general elements of proof would apply for all claims. Any inter-state differences, plaintiffs argue, could easily be handled by use of a special verdict form laying out different standards of proof or elements of causes of action and asking if plaintiffs have met their burden on each one.

In *Amchem,* the plaintiffs sought to aggregate the claims of class members currently injured by asbestos exposure with those who had been exposed and might suffer injury in the future. The Supreme Court affirmed the Third Circuit's decision to decertify the settlement class, in part on the grounds that adequacy of representation was not established. The Court found that the interests of the currently injured were not aligned with the "exposure-only" plaintiffs, and that even

though the named parties between them "alleged a range of complaints," it was problematic for each named plaintiff to serve "generally as representative for the whole" rather than for their "separate constituency." *Amchem*, 521 U.S. at 625–27, 117 S.Ct. 2231. The Court in *Amchem* suggested, however, that establishing subclasses, each with its own adequate representative, might solve the problem. *Id.*

In *Visa Check*, plaintiffs—large merchants, small merchants, and trade associations—sued Visa and Mastercard, alleging illegal tying in violation of the Sherman Antitrust Act. The Second Circuit noted that, even though each group of plaintiffs had potentially different interests depending on the damages formula the court might choose to employ, those differences were not sufficient to defeat class certification. 280 F.3d at 144–45. All class members, the court emphasized, shared a common interest in proving the primary theories that the named plaintiffs had articulated, even if some of the groups had greater interests in proving particular parts of the theories than others. *Id.*

█ Applying these standards, the court will take up each of the defendants' contentions in turn to determine whether they defeat plaintiffs' claims of adequacy. The first contention involves standards of proof. Whether varying standards of proof with regard to the state law claims defeat predominance will be discussed below, but at this point, the inquiry is limited to adequacy. The court determines that the potential for varying standards of proof under state law does not defeat adequacy: the plaintiffs are not rendered inadequate representatives of the class simply because the standards of proof may vary. Like the plaintiffs in *Visa Check*, plaintiffs in each of the proposed subclasses here all have the same interest as other members of the subclass—demonstrating that defendants promised to structure an amount with a certain value or cost, but then deducted 15% from that amount, and that doing so violated RICO, breached the settlement agreements, and constituted fraud and unjust enrichment of defendants. All plaintiffs wish to offer the most robust proof of their claims available to them in order to convince a jury that they should recover under any applicable standard. Even though the elements of the state law causes of action and burdens of proof vary, the nature of plaintiffs' evidence in favor of their claims will be the same regardless of the standard. By contrast, subdividing plaintiffs by state and requiring each group to bring a separate suit could very well make suits infeasible and prevent plaintiffs from recovering at all. *See Amchem*, 521 U.S. at 617, 117 S.Ct. 2231 (explaining that the policy rationale behind a Rule 23(b)(3) class action is to vindicate "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all").

The second question regards whether extra-contractual evidence should be admitted. This objection, of course, is limited to the breach of contract claim, as plaintiffs may use written representations outside the four corners of the settlement agreement to establish a RICO violation under federal law, or fraud or unjust enrichment under state law. Because the court declines to certify the breach of contract claim, it need not further consider this question.

With regard to the qualifications, experience, and ability of counsel, plaintiffs are currently represented by attorneys from four law firms who, between them, have local and national experience litigating class actions. Defendants make similar arguments about plaintiffs' counsel as they do about the inadequacy of plaintiffs as class representatives. Defendants do not attack counsel's competence, but they contend that interclass conflicts render proposed class counsel inadequate, because they would accede to strict standards and "gamble away" possible recovery of class members in more favorable jurisdictions. They also argue that representations that counsel would not resort to parol evidence would substantially weaken claims of proposed class members for whom extrinsic evidence would be valuable.

The court determines that the counsel is qualified and able to undertake the representation in this case. With regard to defendants' contentions, the analysis is identical to that the court conducted with regard to the adequacy of the class representatives. Plaintiffs have explicitly excluded from their breach of contract subclass those for whom

extrinsic evidence would be needed. The court determines that there is no conflict, and that the adequacy of counsel has been demonstrated.

The court has determined that plaintiffs have met their burden to establish the four prerequisites required by Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. The court now turns to analysis of whether the predominance requirement is met.

### F. Predominance of Common Issues Over Individual Issues

■ To satisfy the predominance requirement, "questions of law or fact common to members of the class [must] predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). The inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623, 117 S.Ct. 2231. While the commonality inquiry requires only that common questions exist, the predominance inquiry is more difficult to satisfy. See Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir.2002). Predominance is satisfied only if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Id. If common issues predominate as to liability, the court should ordinarily find predominance, even if some "individualized damage issues" exist. See In re Visa Check, 280 F.3d at 139–40.

Together with the superiority requirement, the predominance requirement helps ensure that class certification serves the "economies of time, effort, and expense, . . . [and] uniformity" for which class actions are designed, and avoids "sacrificing procedural fairness or bringing about undesirable results." Amchem, 521 U.S. at 615, 117 S.Ct. 2231. In determining whether the plaintiffs have demonstrated predominance, the court must take into account any rebuttal evidence offered by defendants at the class certification stage.

In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 485–86 (2d Cir.2008).

Plaintiffs argue that the common issues of law and fact—that each class member has been injured by the same policy and in the same way—predominate over any non-common issues, the variations in state law, and the variations in the representations made to each plaintiff. The plaintiffs claim that the quotation documents generated for each class claimant contain the same false and misleading information, namely, that what these documents represent as the "total premium" does not account for the 15% fee.[3] One-third of the quotation documents also contain a line-item for "total policy fees" that also does not include the 15% of fees at issue in this case. For each class claimant, plaintiffs allege, the total premium amount is not the amount actually expended by defendants to purchase an annuity, and each quotation was supposedly calculated based on the "Total Premium," but it was actually based on less. In each case, plaintiffs allege, defendants failed to disclose that the payment streams were worth only 85% of their cost or purported value. Plaintiffs contend that no plaintiff was told that the streams were worth only 85% of their cost or purported value, because this fact was not even disclosed to the brokers who communicated with plaintiffs.

Defendants devote the bulk of their brief to contesting predominance. They argue that the communications between plaintiffs and defendants that underlie plaintiffs' claims varied considerably and are thus not appropriate for class treatment. Some claimants were provided a total figure based on "cost," while others were based on "value." The quotation documents, defendants counter, were not seen or relied upon by most plaintiffs, and they exhibit material variations, including whether they make reference to cost or value, premium, and expected rate of return. Defendants note that there were no uniform scripts, standardized materials, or uniform training provided to brokers.

The defendants point to variations in the settlement agreements as well, including that

---

**3.** At oral argument, plaintiffs acknowledged that they could not demonstrate, at the class certification stage, that everyone received a quote sheet. Oral Arg. Tr. at 76.

some mention they will be funded through an annuity while others leave the choice of the funding mechanism to the insurer. Those settlement agreements that do make reference to a total amount to be structured call it by different names—"present value," amount "placed in," "stated purchase price," "total cost to provide above benefit," or "present day cost of settlement."

Defendants also argue that, in contrast to plaintiffs' allegations that only 85% of the represented amount was "invested" for the benefit of claimants, in reality no investments were made for individual annuities, and that the amount the issuer set aside to fund each annuity varied with the circumstances. Defendants also claim that plaintiffs entered into these agreements in a myriad of different situations that the court must consider: some followed negotiations while others followed lawsuits; some went to mediation and others did not; some claimants had attorneys represent them and others did not. Defendants also argue that plaintiffs could not have been uniformly deceived because they had differing levels of knowledge about how annuities worked. Finally, defendants argue that a myriad of state laws govern the admissibility of the idiosyncratic communications in each case where the settlement agreement does not provide for a total structured amount. In short, defendants contend that class treatment is not appropriate because the claimants did not hear the same things, see the same documents, place same importance on various aspects of settlements, or execute materially identical settlement agreements.

The court will consider whether common issues predominate over individual issues with respect to each claim in turn.

### 1. *RICO Claim*

■ To establish a claim under RICO's private right of action, a plaintiff must show "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *DeFalco v. Bernas,* 244 F.3d 286, 305 (2d Cir.2001) (citation omitted).

#### a. *Violation of RICO Statute*

To prove a violation of Section 1962(c), a plaintiff must demonstrate an injury to business or property caused by "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *City of New York v. Smokes–Spirits.Com, Inc.,* 541 F.3d 425, 439 (2d Cir.2008) (citation omitted); *see also Bridge v. Phoenix Bond & Indemnity Co.,* —— U.S. ——, ———–——, 128 S.Ct. 2131, 2137–38, 170 L.Ed.2d 1012 (2008) (discussing RICO's private right of action). The enterprise must also be one "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(c).

#### i. *Conduct*

Participation "in the conduct of [the] enterprise's affairs" means "participation in the operation or management of the enterprise." *DeFalco,* 244 F.3d at 309 (citing *Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)). "RICO liability is not limited to those with primary responsibility for the enterprise's affairs...." *Reves,* 507 U.S. at 179, 113 S.Ct. 1163.

At this stage, the court need only resolve whether common issues predominate over individual issues with respect to conduct. Plaintiffs claim that defendant "The Hartford" managed the BAP enterprise, while the various other defendants participated in the operation "by carrying out The Hartford's uniform policies." At oral argument, the defendants conceded that common issues predominated with respect to conduct. Oral Arg. Tr. at 72. The defendants dispute plaintiffs' characterization of the settlement structuring process, but do not dispute defendants' participation in structuring the settlements at issue in this case. The court finds predominance on the issue of conduct.

#### ii. *Enterprise*

■ A RICO enterprise "includes any individual, partnership, corporation, association, or legal entity, and any union or group of officials associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[E]vidence of an ongoing organization, the associates of which function as a continuing unit, suffices to prove an enterprise." *DeFalco,* 244 F.3d at 307 (citations omitted). The

enterprise must be distinct from the defendant, and an association of employees acting within the scope of their employment is not considered "distinct" from their employer. *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir.1994).

Defendants established a Broker Assistance program "BAP" that gave independent brokers the right to work with claimants. The BAP program, as plaintiffs allege, is an "ongoing partnership between the Hartford and certain brokers." It is undisputed that these brokers are not employees of any defendant and therefore are distinct entities. At oral argument, defendants conceded that common issues predominated with respect to enterprise. Oral Arg. Tr. at 72. The court therefore finds predominance on the issue of enterprise.

### iii. *Pattern*

A " 'pattern of racketeering activity' requires at least two acts of racketeering activity within a ten-year period." *DeFalco*, 244 F.3d at 306 (quoting 18 U.S.C. § 1961(5)). Over 9,000 settlements were structured within the time period at issue in this case by the "enterprise" identified in the previous section. The court determines that the pattern element is satisfied.

### iv. *Racketeering Activity*

"Racketeering activity" includes mail fraud and wire fraud. *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 220 (2d Cir.2008) (citing 18 U.S.C. § 1961(1)). "The 'essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.'" *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir.2007) (citation omitted). The predominance of common issues as to the second and third elements is not in dispute; the issue is whether common issues predominate over individual issues in determining whether defendants engaged in a "scheme to defraud."

The law governing RICO class actions has evolved considerably in recent years. In *Moore v. PaineWebber, Inc.*, the Second Circuit applied the predominance requirement to a RICO and common-law fraud case alleging oral misrepresentations. It explained that "fraud claims based on uniform misrep-resentations made to all members of the class ... are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof." 306 F.3d at 1253. On the other hand, even where plaintiffs can demonstrate that defendants engaged in a common course of systematic fraud, "[w]here there are material variations in the nature of the misrepresentations ... class certification is improper." *Id.* at 1253–55. In *McLaughlin v. American Tobacco Company*, a suit by smokers against cigarette manufacturers that featured widespread and uniform misrepresentations in marketing materials, the Second Circuit reversed a grant of class certification, explaining that the representations only satisfied "half of the equation," and that "the other half, reliance on the misrepresentation, cannot be the subject of general proof." 522 F.3d at 223–25.

Defendants seek to liken this case to *Moore*, in which class certification was denied because plaintiffs did not demonstrate that class members "received materially uniform representations," 306 F.3d at 1255, and *McLaughlin*, which denied certification because reliance could not be the subject of general proof under the circumstances. They claim that plaintiffs need proof of the statements made to each plaintiff, the nature of the statements, and reliance.

In a recent case that post-dates *McLaughlin*, the Supreme Court held, in a RICO claim predicated on mail fraud, that a plaintiff need not demonstrate reliance on the defendant's alleged misrepresentations, either to establish its claim or to demonstrate proximate cause. *Bridge v. Phoenix Bond & Indemnity Co.*, —— U.S. ——, ——, ——, 128 S.Ct. 2131, 2139, 2145, 170 L.Ed.2d 1012 (2008). Demonstrating an injury, including factual and proximate causation, is still required, and proving factual cause and/or proximate cause will frequently require proof that a plaintiff prove reliance by the plaintiff or another party on defendant's misrepresentation that resulted in injury to the plaintiff. *See id.* at 2139, 2144. But reliance itself is not "an element of the cause of action." *Id.* at 2144.

The court agrees with plaintiffs' contention that, after *Bridge,* the *Moore* and *McLaughlin* decisions are no longer good law on the question of whether a plaintiff must show that he or she was personally a recipient of a material misrepresentation. After *Bridge,* a RICO plaintiff need not demonstrate that a material misrepresentation was made *to the plaintiff.* A material misrepresentation still must be made, however, in order to establish a "scheme to defraud," and there must be proof that the material misrepresentation was made *in the case of* each class member, in order to make that person a part of the class. *Cf. Moore,* 306 F.3d at 1255. Therefore, while direct receipt of a misrepresentation by the plaintiff need not be proven, and explicit reliance need not be shown, plaintiffs still must demonstrate that defendants made standardized misrepresentations in their cases in order to satisfy the predominance requirement on their RICO claim.

In their briefs, plaintiffs focus their claim of misrepresentation on language contained in the standardized written quotations generated by defendants' software program. Defendants counter that the quotation sheets were not standardized, exhibited material variation, and furthermore, that few plaintiffs received or relied upon them.

At oral argument, plaintiffs acknowledged that they could not demonstrate, at the class certification stage, that everyone received a quote sheet. Oral Arg. Tr. at 76. Plaintiffs have, however, limited their class definition to claimants who "had a written contract specifying, or before entering into the written contract had received a written representation as to, the total or present value of the settlement or portion of the settlement being structured or the amount to be used to fund the structure." [4]

This court has reviewed the record, including the written representations of total dollar amounts to be structured, other than quote sheets, that were undisputably received by claimants. While these representations come in various forms, once divided into "cost" and "value" representations as detailed under *Subclasses, supra,* the core of the representations—a total dollar amount specifying a "cost" or "value" for the "total [amount] ... of the settlement or portion of the settlement being structured or the amount to be used to fund the structure"—are sufficiently similar to satisfy the uniformity requirement of *Moore.* Plaintiffs have excluded from the class those claimants to whom a total dollar amount was not specified, whose cases would raise difficult issues with regard to predominance.

Ultimately, defendants may prevail on the merits by demonstrating that the representations were not fraudulent. They may also succeed in limiting the definition of those damaged (on summary judgment or at trial) to those who fall into one subclass or the other—for example, those whose representations specified a "value," as opposed to a "cost." But for the purposes of class certification, with the class definition proposed by plaintiffs, and the "cost" and "value" subclasses determined by the court, the resolution of factual and legal questions can be largely achieved through generalized proof, and these questions predominate over the handful of issues subject only to individualized proof. *See Moore,* 306 F.3d at 1252. That is, the "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231.[5]

### v. *Interstate Commerce*

"The law in this Circuit does not require RICO plaintiffs to show more than a minimal effect on interstate commerce." *DeFalco,* 244 F.3d at 309. There is no dispute that the insurance transactions at issue in this case qualify as interstate commerce. *Cf. Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 115 (2d Cir.2001).

### b. *Injury to Business or Property Caused by RICO Violation*

Plaintiffs must demonstrate that the "requisite injury to 'business or property' is

---

4. A quote sheet generated purely for internal use by The Hartford and never provided to anyone could not be such a representation, because it would not be a "representation," nor would it have been "received" by the claimant.

5. Whether plaintiffs can show predominance with regard to factual and proximate cause will be discussed in the court's analysis of whether the injury requirement is met, *infra.*

susceptible to class-wide proof." *McLaughlin*, 522 F.3d at 227. That is, they must show predominance on the issues of "but-for" and "proximate cause." *See Bridge*, 128 S.Ct. at 2141 (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265–66, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)). The evidence must establish "loss causation, meaning that the defendant's misrepresentations caused the plaintiff 'to suffer economic loss.'" *McLaughlin*, 522 F.3d at 226. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006).

Plaintiffs contend that all class members were directly injured in the same way by the scheme, specifically that claimants were identically defrauded of the "full benefits of their settlements" by receiving a structured settlement (or portion of a settlement) worth 15% less than the bargained-for amount. Defendants argue that plaintiffs cannot demonstrate without individualized proof that any, let alone all, class members would have rejected their settlements had they known that they were being deprived of 15% of their value, and thus that the nature of injury, if any, cannot be shown without individualized proof.

The court is persuaded that common issues predominate over individual issues on the nature of the injury and loss causation. After *Bridge*, reliance need not be proven to demonstrate injury. The injury alleged is not that plaintiffs would have rejected their settlements had they known of the alleged scheme, but rather that plaintiffs received less than the total amount which they agreed to receive in release of their claims. The cause of this injury was defendants' alleged fraudulent misrepresentations as to the amount of settlement funds being structured. Of course, a jury may ultimately decide that plaintiffs received what they bargained for and thus suffered no injury. Or they may decide that the "value" plaintiffs suffered an injury but the "cost" plaintiffs did not. For the purposes of the predominance inquiry on the RICO claim, however, the court need not resolve the merits question of whether plaintiffs have in fact demonstrated an injury—it is sufficient that plaintiffs have demonstrated that the form and causation of the alleged injury was sufficiently uniform to be susceptible of class-wide proof.

### 2. *State Law Claims*

■ "In a multi-state class action, variations in state law may swamp any common issues and defeat predominance." *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir.1996). The court must make an inquiry into the laws of the states at issue and consider whether variations defeat predominance or make a class action unmanageable. *Id.* at 741–42. If the legal standards across states vary to a significant degree, the court cannot determine that the predominance requirement has been met. However, "if a claim is based on a principle of law that is uniform among the states, class certification is a realistic possibility." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004). Similarly, minor differences do not defeat class certification: "[c]ourts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit." *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir.1998). As with all class certification issues, "[t]he burden of showing uniformity or the existence of only a small number of applicable standards (that is, 'groupability') among the laws of the fifty states rests squarely with the plaintiffs." *Klay*, 382 F.3d at 1262.

For each of plaintiffs' state law claims, the court must determine what law applies and whether that law is sufficiently uniform on each issue. Federal courts must apply state law to state law claims. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In answering the question of which state's law to apply, federal courts apply "the conflict-of-laws rules of the state in which the federal court sits." *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir.2002); *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Connecticut law provides that a court must first determine whether the laws of the vari-

ous states "relevant to the set of facts are the same or would produce the same decision in the lawsuit. . . ." *Haymond v. Statewide Grievance Comm.*, 45 Conn.Supp. 481, 488–89, 723 A.2d 821 (Conn.Super.1997), *aff'd*, 247 Conn. 436, 723 A.2d 808 (1999) (internal citations and quotation marks omitted). If so, it is a "false conflict" and the case gets decided "under the law that is common to both states." *Id.* If there is an actual conflict, then the court turns to an analysis of the "interests of the respective jurisdictions." *Id.* For those claims on which predominance is met with regard to the legal standards, the court will consider whether common issues predominate over individual issues with regard to the facts of each claim.

### a. *Fraud*

Fraud is a tort. Traditionally, Connecticut courts applied the common law doctrine of *lex loci delicti*, that "the substantive rights and obligations arising out of a tort controversy are determined by the law of the place of injury." *O'Connor v. O'Connor*, 201 Conn. 632, 637, 519 A.2d 13 (1986). Where "application of the doctrine of lex loci would produce an arbitrary, irrational result," Connecticut courts look to the Restatement instead. *O'Connor*, 201 Conn. at 649–50, 519 A.2d 13. "Recently, courts applying Connecticut choice-of-law law have used the Restatement approach even where lex loci would lead to the same result." *United States Fidelity & Guaranty Co. v. S.B. Phillips Co., Inc.*, 359 F.Supp.2d 189, 206 (D.Conn.2005). This court will "follow the trend" and apply the "most significant relationship" analysis set forth in Sections 6 and 145 of the Restatement (Second) that the Connecticut Supreme Court adopted in *O'Connor. Id.*

The Restatement (Second) provides that, "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement 2d of Conflict of Laws ("Rest. 2d"), § 145(1). Section 6 of the Restatement provides that, absent a statutory directive:

the factors relevant to the choice of the applicable rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Rest. 2d, § 6(2). The choice of law analysis set forth in sections 145 and 6 are applied by "weighing . . . the relative significance of the various factors that § 6 lists." *O'Connor*, 201 Conn. at 651, 519 A.2d 13.

To assist in the evaluation of these policy choices, the Restatement provides further guidance: "Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Rest. 2d, § 145(2). The relative importance of these contacts is determined with respect to the issue at hand. *Id.*

For the purposes of analyzing contacts under section 145, there are at least two states whose interests are at stake in each claim—Connecticut, where defendants have their principal place of business, and the state where plaintiffs negotiated their settlement, typically but not always the state of the plaintiffs' residence.

Both the *lex loci* and Restatement approaches favor applying the law of the state where the settlement was negotiated. The effect of the defendant's alleged fraud injured plaintiffs in their home states, and in negotiating and settling claims, it was reasonable for both plaintiffs and defendants to assume that their conduct was governed by the laws of the state in which the negotiation and settlement took place. Furthermore, many (although not all) of the settlement agreements contain a choice of law clause pointing to the state where the settlement was recorded (frequently the plaintiff's state

of residence). While not dispositive on the tort claims, it reflects those parties' understanding that the laws of the state in which the agreement was entered into, and not the state in which the insurer was based, would govern any future claims. Other contracts provide that Connecticut law will govern; for fraud claims relating to those settlements, there is a stronger argument for applying Connecticut law, because the parties negotiating and settling their agreements expected that Connecticut law would apply to the agreement's interpretation. Because the proposed class includes plaintiffs from across the United States whose settlements were negotiated in many different states, the fraud claims in this case implicate the laws of a wide variety of jurisdictions.

The court must also address the issue of the statute of limitations to be applied. Plaintiffs have demonstrated that the court must apply Connecticut law regarding the statute of limitations to the state law fraud claims. "Under Connecticut's choice of law rules, if the underlying claim existed at common law, the statute of limitations is considered procedural." *Stuart & Sons, L.P. v. Curtis Pub. Co., Inc.*, 456 F.Supp.2d 336, 343 (D.Conn.2006); *see Baxter v. Sturm, Ruger and Co., Inc.*, 230 Conn. 335, 339–40, 644 A.2d 1297 (1994). Fraud existed at common law. *See Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Investors, L.P.*, 260 Conn. 766, 777–78, 802 A.2d 44 (2002) (fraud). Defendants argue that the Connecticut Supreme Court would today consider the choice of law issue to be substantive. Defendants point to section 142 of the Restatement, suggesting that it may have been recently amended. Oral Arg. Tr. at 71–72. That section, last amended in 1988, provides as follows:

> Whether a claim will be maintained against the defense of the statute of limitations is determined under the principles stated in § 6. In general, unless the exceptional circumstances of the case make such a result unreasonable:
>
> (1) The forum will apply its own statute of limitations barring the claim.
>
> (2) The forum will apply its own statute of limitations permitting the claim unless:

> (a) maintenance of the claim would serve no substantial interest of the forum; and
>
> (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.

Rest. 2d, § 142 (rev.1988). Defendants note that Connecticut now follows the Second Restatement, and thus that the court should apply the Restatement's "most significant relationship" test. Oral Arg. Tr. at 71–72. As discussed, the court agrees with defendants that Connecticut courts are trending towards following the Restatement's "most significant relationship" test in place of traditional rules. However, the Connecticut Supreme Court's decision in *Baxter*, which applied Connecticut's traditional choice of law rule that the statute of limitations for common law claims is considered procedural, postdates both *O'Connor* and the 1988 revision to section 142. Until the Connecticut Supreme Court declares otherwise, it is this court's conclusion that it should follow the traditional rule. Therefore, for the purposes of class certification, the court determines that the Connecticut statute of limitations applies to state law fraud claims, and thus common issues predominate over individual issues with respect to the statute of limitations.

The court will now determine whether, in spite of the varying substantive law to be applied, common issues nevertheless predominate on the fraud claims. The underlying theory of the state law fraud claims is similar to the RICO claim, though they pose several additional difficulties for the plaintiffs. First, as defendants point out, there are legal variations in how states treat fraud claims. Second, there is the question of whether plaintiffs can prove reliance. Plaintiffs, for their part, claim the variations are immaterial and can be dealt with through a properly-worded verdict form, with plaintiffs offering proof sufficient to satisfy each claim. The court will consider each issue in turn.

The first question is whether the law of fraud varies from state to state. As plaintiffs have demonstrated, the fundamental elements of fraud are substantially similar from state to state. *See* Pls.' App. at APP0197–

APP0212. Virtually every state requires that there be a misrepresentation made by the defendant, that the defendant had knowledge that it was false, the defendant intended to induce the reliance of the plaintiff, the plaintiff relied on the statement, and the plaintiff was injured as a result.[6] *See, e.g., Suffield Dev. Assocs. Ltd. P'ship*, 260 Conn. at 777, 802 A.2d 44 ("The essential elements of an action in common law fraud ... are that (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury."); *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4th 979, 22 Cal.Rptr.3d 352, 102 P.3d 268, 274 (2004) (citation omitted) ("The elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage."); *Van Kleeck v. Hammond*, 25 A.D.3d 941, 811 N.Y.S.2d 452, 454 (N.Y.App.Div.2006) (citation omitted) ("The elements of fraud include a misrepresentation, known by the defendant[s] to be false and made for the purpose of inducing the plaintiff to rely upon it, justifiable reliance and damages").

Plaintiffs have also pointed out that every state provides that the "misrepresentation" element can be satisfied by a material omission where there is a duty to disclose, known in some states as "suppression," "concealment," or "fraudulent nondisclosure." Pls.' App. at APP0197–APP0212. Defendants do not substantively dispute this point but contend that the standards as to when a duty to disclose exists vary from state to state.

Defendants accurately point out that states vary in their required standards of proof for fraud claims: some require clear and convincing evidence; others require a preponderance of the evidence. Some states require that plaintiffs show reliance was rea-

sonable, others that it was justifiable, and still others that it was justifiable *and* reasonable. Defendants also charge that demonstrating similarities among the "most basic elements of a fraud claim" does not demonstrate that state law variances are immaterial.

The court finds that common legal issues predominate with respect to how states treat fraud claims. Plaintiffs have adequately demonstrated that the elements of fraud are substantially similar from state to state. With regard to the differing standards of proof and other requirements pointed out by the defendants, the court agrees with plaintiffs that, because the underlying factual proof is the same, these differences could be adequately addressed with a verdict form and do not defeat predominance.

Second, plaintiffs must also demonstrate that "reliance on th[e] misrepresentation was the proximate cause" of their losses. *See Moore*, 306 F.3d at 1255. The parties dispute whether plaintiffs can rely upon classwide proof to demonstrate reliance. Plaintiffs claim that everyone relied on the representation of the total settlement *amount* in the same way and, as such, reliance is "self-proving." Plaintiffs explain that there was reliance common to the class as a whole because there were standardized misleading documents that claimants received, that each document contained similar misrepresentations, that each claimant got less than the premium reflected they should get, and that each claimant relied on the settlement amount in determining whether to accept the settlement. Plaintiffs add that reliance can be presumed when there is an "omission" of material fact—here, the uniform failure to disclose the 15%. Furthermore, plaintiffs say, even if the court rejects the self-proving theory, circumstantial evidence common to the class supports a finding of reliance—namely, that all plaintiffs released their claims in exchange for an agreed-upon amount, from which 15% was then surrepti-

---

**6.** Some states allow fraud claims where the falsity of the representation was made with reckless indifference to the truth, even if the falsity was not known to the defendant. *See, e.g., Nails v. S & R, Inc.*, 334 Md. 398, 639 A.2d 660, 668 (1994). In this case, plaintiffs rest their fraud

claim on a knowing false representation. They have not offered a theory of proof relying on reckless indifference of the falsity of the representation, so the court need not further consider this issue.

tiously deducted. Defendants counter that reliance cannot be presumed without evidence of what each class member knew or thought, which should defeat predominance.

The Second Circuit discussed the possibility of proving reliance using class-wide proof in *McLaughlin* and *Moore*. *Moore* explained that where misrepresentations are "materially uniform," "an individual plaintiff's receipt of and reliance upon the misrepresentation may then be simpler matters to determine." 306 F.3d at 1255. *Moore* therefore suggests that a finding of uniformity facilitates a finding of reliance. But *McLaughlin* cautioned against finding reliance in fraud class actions, suggesting that "individualized proof" is usually necessary to prove that reliance on the misrepresentation, and not some other cause, was the proximate cause of plaintiff's loss. 522 F.3d at 223.

Nationally, courts have rarely certified nationwide fraud classes on a "presumed reliance" theory outside of the context of securities litigation. *See In re Ford Motor Co. Vehicle Paint Litigation*, 182 F.R.D. 214, 221–22 (E.D.La.1998) (citing cases). But *McLaughlin* explicitly declined to adopt the rule of some other circuits that a requirement to prove individual reliance necessarily defeats certification in a proposed fraud class action. 522 F.3d at 224–25. It made clear that "proof of reliance by circumstantial evidence may be sufficient under certain conditions," pointing specifically to examples of certification where "payment" was held to "constitute circumstantial proof of reliance upon a financial representation." 522 F.3d at 225 & n. 7. The cases *McLaughlin* cited include a case relied upon by plaintiffs, *Chisolm v. TranSouth Fin. Corp.*, which found self-proving reliance where plaintiffs signed uniform contracts and received standardized forms as part of a uniform fraud scheme. 194 F.R.D. 538, 559–61 (E.D.Va.2000). This theory is akin to the fraud-on-the-market theory of reliance that the Supreme Court approved for securities fraud claims. *See Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Even *Chisolm* acknowledged, however, that "the rationale for the [presumed reliance] theory ... does not easily extend to general fraud claims." 194 F.R.D. at 560. The *McLaughlin* court distinguished *Chisolm* on the

grounds that consumer purchases implicate a greater degree of "personal idiosyncratic choice" than financial transactions, but in citing it, suggested that it might approve of its rationale on its facts.

*McLaughlin* similarly looked to and distinguished *Klay v. Humana, Inc.,* in which the Eleventh Circuit "concluded that it did 'not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due.'" *McLaughlin*, 522 F.3d 215, 225 n. 7 (citing *Klay*, 382 F.3d at 1259). *Klay* involved physicians who alleged that HMOs systematically denied, delayed, and diminished payments due to the physicians, and failed to tell them about the underpayment. *Klay*, 382 F.3d at 1246–47. Physicians under "fee-for-service" arrangements alleged that the HMOs set up their computer systems to wrongfully deny reimbursement for certain procedures, interpret other codes as requesting reimbursement for less expensive procedures, group certain codes together, ignore modifiers that would increase the amount reimbursed, and delay reimbursement claims unnecessarily. *Id.* at 1248. The physicians also alleged that the HMOs sent the physicians "explanation of benefits" forms that misrepresented or concealed how the claims were actually processed. *Id.* As with *Chisolm*, in distinguishing *Klay*, the Second Circuit in *McLaughlin* suggested that it might approve of *Klay*'s rationale on its facts: "But assuming that most individuals are led to believe that they will get paid when they sign a contract calling for payment is very different from assuming that most individuals purchased a consumer good in reliance upon an inference that they draw from its marketing and branding rather than for some other reason." 522 F.3d at 225 n. 7.

The court is persuaded that the facts of this case tack closer to the "reliance on a financial representation" declared appropriate for class certification in *Chisolm* and *Klay* than the consumer fraud class found inappropriate for certification in *McLaughlin*. Plaintiffs have requested certification only for those class members who received a "written representation as to, the total or

present value of the settlement or portion of the settlement being structured or the amount to be used to fund the structure." Plaintiffs have not demonstrated that claimants received standardized representations. However, although these allegedly fraudulent representations were not identical in each case, they were sufficiently uniform—once divided into "cost" and "value" subclasses—to be susceptible of class-wide proof. Though it is true, as defendants point out, that each plaintiff may have accepted his or her settlement for somewhat different reasons, it is equally clear that every plaintiff to whom a total dollar figure was represented relied on that dollar figure in deciding whether to accept the settlement. Thus, "while each plaintiff must prove his own reliance in this case . . . based on the nature of the misrepresentations at issue, the circumstantial evidence that can be used to show reliance is common to the whole class." *Klay*, 382 F.3d at 1259. Defendants claimed, in a writing received by each class member, that they were structuring a certain dollar amount—that is, that the periodic payments to be received represented a certain total "value" or "cost." *See* Pls.' Rev. Second Am. Compl. at ¶ 51 (restricting class definition to those who received written representations of "the total or present value of the settlement or portion of the settlement being structured or the amount to be used to fund the structure"). Once subdivided into "cost" and "value" subclasses, the court determines that common issues predominate with regard to the question of whether each plaintiff, in entering into a structured settlement, relied upon the defendants' written representations and assumed they would receive payments valued at, or costing, the total agreed amount.

### b. *Breach of Contract*

Many of the settlement agreements contain a choice of law clause. Where parties to a contract choose a particular state's law to govern the contract, Connecticut honors that choice unless "the chosen state has no substantial relationship to the parties or transaction" or "application of the law of the chosen state would be contrary to a fundamental policy of a state which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Elgar*

*v. Elgar*, 238 Conn. 839, 850, 679 A.2d 937 (1996) (citing Restatement (Second) Conflict of Laws § 187).

This case calls for applying the laws of up to fifty states to the breach of contract claim. The named plaintiffs' contracts each provide for governance under a different state's law; the record indicates that class members' contracts similarly provide for governance under the laws of various states. Some courts have found that the rules governing contract interpretation are largely similar across the 50 states. *See, e.g., Klay*, 382 F.3d 1241, 1262–63 ("A breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey."). Whether legal differences alone might preclude certification is a close question. But this question need not be addressed, because individualized questions of fact preclude a finding of predominance on the breach of contract claims.

The key factual question affecting predominance is whether there were material variations in the contracts or in the method by which defendants breached them. Plaintiffs have limited their breach of contract claim to a class of individuals whose settlement agreements state the total cost or value of the settlement, or the cost or value of the portion being structured. Therefore, as plaintiffs point out, they will not need to dispute the enforceability of merger or integration clauses or rely upon parol evidence to prove their claims, and they have assented to relying upon language within the four corners of the settlement agreements. However, defendants dispute that the agreements are themselves materially uniform, pointing to the variance in terms and the different meanings of "cost," "value," and "present value." They note that the contracts are not a single form, but vary based on the substance of the negotiations and the state in which they were signed. They have submitted voluminous appendices demonstrating that an array of contracts were employed in the structured settlements at issue.

The court has reviewed many of the agreements submitted and determined that, while they do exhibit patterns to some extent, they

are not sufficiently uniform to allow common issues to predominate in a class-wide breach of contract action involving over two thousand contracts. Pls.' Reply at 4 n. 3 ("2,465 class members in the breach of contract subclass"); *see Klay*, 382 F.3d at 1263 ("The sheer number of contracts involved is one factor that makes us hesitant to conclude that common issues of fact predominate; this is not a situation in which all plaintiffs signed the same form contract."); *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 340 (4th Cir.1998) ("[P]laintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts."). Plaintiffs seek to narrow the inquiry into variation to whether the contract provided for a "cost" or "value," using subclasses, a jury form, and appropriate testimony to sort out the differences. However, because defendants will argue that each agreement only entitled plaintiffs to the stream of payments specified, the relationship of the language defining the total "cost" or "value" to the language specifying a stream of payments would need to be carefully considered to determine whether defendants breached each contract at issue. In contrast to the fraud and RICO claims, which will focus on whether the representation of a total "cost" or "value" was itself fraudulent irrespective of the fact that the nominal dollar amount of the periodic payments was also disclosed, determining breach will require a separate analysis of the relationship between the two provisions for every different contract used. The contracts simply exhibit too much variation to permit common issues to predominate over individual issues on the breach of contract claim.

### c. *Unjust Enrichment*

Connecticut courts apply tort choice of law principles to unjust enrichment claims. *Macomber v. Travelers Property & Cas. Corp.*, 277 Conn. 617, 640, 894 A.2d 240 (2006). As such, the choice of law analysis is identical to that conducted on the fraud claims, and the laws of the fifty states will apply to the unjust enrichment claims.

Courts considering unjust enrichment claims in the context of a nationwide class action have frequently found a lack of predominance due to conflicts in legal standards from state to state. *See, e.g., Thompson v.*

*Jiffy Lube Intern., Inc.*, 250 F.R.D. 607, 626 (D.Kan.2008); *Clay v. American Tobacco Co.*, 188 F.R.D. 483, 500–01 (S.D.Ill.1999) In contrast to the legal issues underlying breach of contract claims, which exhibit substantial uniformity from state to state, unjust enrichment claims do not. "[T]he obligation underlying a breach of contract claim comes most immediately from a voluntary agreement, whereas the obligation underlying an unjust enrichment claim comes directly from state law (equity)." *Klay*, 382 F.3d at 1267. Some states require proof of an actual loss or impoverishment, while others do not. *See In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147–48 (S.D.N.Y. 2008). Some states allow an unjust enrichment claim only in the absence of a contract. *See White v. Wachovia Bank, N.A.*, 563 F.Supp.2d 1358, 1371 (N.D.Ga.2008) (discussing Georgia law). Some states allow a claim to go forward only "when there is no adequate remedy at law." *Id.* at 147 n. 9. Some states require the defendant to have engaged in wrongdoing, *see, e.g., DCB Const. Co., Inc. v. Cent. City Dev. Co.*, 965 P.2d 115, 121–23, while others do not, *see, e.g., Schock v. Nash*, 732 A.2d 217, 232 (Del.1999). Sometimes, even courts within a single state offer varying interpretations of the standards of unjust enrichment claims. *See In re Sears, Roebuck & Co. Tools Marketing & Sales Prac. Litig.*, Nos. 05–C–4742 & 05–C–2623, 2006 WL 3754823, at *1 n. 3, 4 (N.D.Ill.2006). Finally, some states use three elements, some have a five part or four part test, while others use one or two elements. *In re Conagra Peanut Butter Products Liability*, 251 F.R.D. 689, 2008 WL 2885951, at *8–9 (N.D.Ga. July 22, 2008). These state-to-state variances in legal standards for unjust enrichment claims are considerably greater than those for fraud claims.

Plaintiffs point to several cases in which courts have certified unjust enrichment claims as part of a nationwide class action. The court agrees with defendants that none of these cases provide a persuasive argument that the standards for unjust enrichment are sufficiently uniform from state to state to permit a finding of predominance. In *In re Terazosin Hydrochloride*, the court granted certification to 19 state-wide classes, not a

national class, and in support of predominance, relied on the Restatement's test on the grounds that courts in the affected states had followed or cited the Restatement or mirrored the Restatement's provisions in creating their own definitions. 220 F.R.D. 672, 697 & n. 40 (S.D.Fla.2004). It acknowledged, but did not address, state-by-state differences in the claims. Similarly, *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, in the context of deciding whether to certify a settlement class, addressed distinctions between unjust enrichment claims in a sentence and failed to offer a persuasive analysis of similarity. 246 F.R.D. 349, 359 (D.D.C.2007). Like *Vista Healthplan, In re Relafen Antitrust Litigation* involved a settlement class action, where state law differences pose less of a barrier to certification. 231 F.R.D. 52 (D.Mass.2005). The case of *Westways World Travel, Inc. v. AMR Corp.* provided only a cursory analysis without addressing whether the claims in fact varied. 218 F.R.D. 223, 239–40 (C.D.Cal.2003). Several cases declined to consider choice of law issues at the class certification stage. *See In re Abbott Laboratories Norvir Anti–Trust Litigation*, 2007 WL 1689899, at *8–10 (N.D.Cal. June 11, 2007); *Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605 (D.S.D.2004); *Singer v. AT & T Corp.*, 185 F.R.D. 681, 691–92 (S.D.Fla.1998); *Mantz v. St. Paul Fire & Marins Ins. Co.*, 2003 WL 23109763 (W.Va. Cir.Ct.2003). Another case, *In re Pennsylvania Baycol Third–Party Payor Litigation*, resolved choice of law issues by deciding that there was no conflict between unjust enrichment laws from state to state. 2005 WL 852135 (Pa.Com.Pl. Apr. 4, 2005). This court respectfully disagrees with that conclusion.

■ Plaintiffs make a valiant effort to show predominance with a series of charts breaking down unjust enrichment claims into "core elements" and four separate "additional elements" that apply in various states. While the court appreciates this effort, the sheer complexity of elements (as the charts demonstrate) suggest why courts have been reluctant to certify unjust enrichment claims. The predominance inquiry helps ensure that class actions provide a means of aggregating like claims for reasons of expediency and justice without sacrificing the requirement that the burden of proof remains on plaintiffs to prove their entitlement to recovery under applicable law. The court determines that the legal variations in unjust enrichment claim defeat a finding of predominance.

As the court has found that legal variations defeat predominance on the unjust enrichment claim, there is no need to consider whether factual variations might also defeat predominance on the unjust enrichment claim.

### 3. *Damages*

■ Even where individualized damage determinations are necessary, it does not prevent a finding that common issues predominate if liability can be determined on a class-wide basis. *See In re Visa Check*, 280 F.3d at 139. The court must nevertheless consider damages "in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." *McLaughlin*, 522 F.3d at 231. The court's inquiry at the class certification stage is limited to determining whether, if individual damages will vary, there is nevertheless a possible and reasonable means of computing damages on a class-wide basis, for example by using a formula or statistical analysis. *See Rodney v. Northwest Airlines, Inc.*, 146 Fed.Appx. 783, 791 (6th Cir.2005); *Klay*, 382 F.3d at 1259–60; *Bell Atlantic Corp. v. AT & T Corp.*, 339 F.3d 294, 303, 307 (5th Cir.2003). Only where the individualized inquiry will be fact-specific and require extensive judicial resources have courts determined that a damages issue should preclude class certification, at least as to the issue of damages. *See, e.g., Owner–Operator Indep. Drivers Ass'n, Inc. v. Landstar System, Inc.*, 541 F.3d 1278, 1296–97 (11th Cir.2008); *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602–04 (5th Cir.2006).

The court finds that the calculation of damages in this case will not be so difficult as to defeat a finding of predominance. The calculation will be individualized, as each class member will be entitled to a different amount of damages based upon the amount of his or her structured settlement. A jury may find that some or all of the "fees" allegedly deducted by defendants were appropriately deducted, and as such the measure of damages may be less than what plaintiffs seek (or

zero). In addition, to the extent defendants modified the software program used to calculate annuities during relevant period of time at issue in this litigation, the damages formula may have to account for not only the total dollar amount but also the date on which the calculations were made. However, because defendants relied upon a single software program to determine annuity quotes and brokers were not permitted to modify the results of those calculations, damages will be susceptible of calculation by mathematical formula. This case will not require the sort of fact-intensive, individualized mini-trials on damages that courts have found may defeat certification.

Defendants also object that determining the availability of prejudgment interest or punitive damages dooms plaintiffs' claims. The court appreciates that determining the availability of prejudgment interest or punitive damages under each state's law may prove difficult. However, this is a minor issue compared to the overall predominance of common issues as identified above, and to some extent is mooted by the court's denial of certification on the breach of contract claim. Thus, the potential variation on this issue does not lead to a determination that common issues do not predominate or that class certification is not warranted.

### G. Superiority of Class Action

To satisfy the superiority requirement under Rule 23(b)(3), plaintiffs must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Four factors are pertinent to a superiority analysis: class members' interest in bringing separate actions, the nature and extent of existing litigation, the desirability of concentrating the litigation in this forum, and management difficulties. *Id.* Rule 23 provides for a comparative inquiry—not whether a class action suit is a good method of adjudicating the claims, but whether it is "superior to other available methods."

### 1. Class Members' Interest in Bringing Separate Actions

Plaintiffs claim that individual litigation would be impractical because each class member's claim is too small to make litiga-tion cost-effective. They add that due to the nature of the injury, many do not even know they were injured, making a class action not only superior but the only feasible method of litigation.

Defendants counter that due to interclass conflicts, class members have an interest in bringing separate actions. The court addresses this issue in conjunction with its discussion of the adequacy of class representatives to represent the class. The court also notes that, because it has declined to certify the breach of contract claims, class members wishing to vindicate breach of contract claims will be forced to bring separate actions.

The court determines that any hypothetical interest in bringing individual suits does not outweigh the impracticality and feasibility of litigating many individual actions on the same facts. Therefore, this factor points towards a finding of superiority.

### 2. The Nature and Extent of Existing Litigation

Neither plaintiffs nor defendants have called the court's attention to any other litigation pending on this matter, and the court is aware of none.

### 3. The Desirability of Concentrating the Litigation in this Forum

Where predominance is established, the desirability of concentration often follows. First, having one trial, as compared to thousands, makes sense. Both plaintiffs and defendants will benefit from the certainty of establishing whether defendants' conduct did or did not violate the rights of plaintiffs. Second, this class action involves "vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all,'" which the Advisory Committee and the Supreme Court have both recognized is the primary purpose behind a(b)(3) class action. *See Amchem,* 521 U.S. at 617, 117 S.Ct. 2231.

Plaintiffs argue, and the court agrees, that concentrating the claims in one court simplifies the litigation process and doing so in this District is advisable. The Hartford's principal place of business is here, most relevant

documents can be found here, and witnesses reside here.

#### 4. *Management Difficulties*

The court knows of no management difficulties specific to this action that preclude a finding of certification.

Having determined that common issues predominate over individual issues with respect to plaintiffs' RICO and fraud claims, the court has identified no additional management difficulties which will defeat a finding of superiority. Rather, the court finds that this case is well suited for class action and the management difficulties of a class action pale in comparison to the difficulties and feasibility of trying this case thousands of times in courts across the country.

#### H. *Ascertainability of Class*

Though not a formal part of the Rule 23 inquiry, defendants raise a separate objection on the grounds of ascertainability. Defendants argue that the class is not ascertainable and thus should not be certified. They claim that, because plaintiffs exclude from the proposed class "persons who were represented by a plaintiffs' broker in.connection with the settlement," ascertaining who is in the class would require individual proof of whether each claimant had a broker. Plaintiffs counter that the population of sample files, by definition, excluded claimants who retained plaintiffs' brokers. They acknowledge the possibility that a claimant could have been working with a plaintiffs' broker without the knowledge of defendants, but say that because there is no evidence of a single instance where this occurred, it is a "speculative" objection that cannot defeat class certification.

The court agrees that speculative objections cannot defeat class certification. *See Srail v. Village of Lisle,* 249 F.R.D. 544, 553–555 (N.D.Ill.2008) (finding that speculative questions and arguments do not defeat class certification); *Cross v. 21st Century Holding Co.,* 2004 WL 307306, at *3 (S.D.N.Y.2004) (finding that speculative concerns about the plaintiff's suitability as a class representative were not sufficient to defeat class certification). Defendants' databases were designed to keep track of who had and had not retained plaintiffs' brokers, and thus can be used to ascertain the members of the class. Defendants have not pointed to evidence that plaintiffs in fact retained brokers without notifying The Hartford. Indeed, the fact that hundreds of claim files were excluded from the sample pool because a plaintiffs' broker was involved suggests that defendants were aware when a plaintiff had retained a broker and that this information was recorded in the database. Defendants point to cases finding a lack of ascertainability, but each of these cases involved a class with a much more speculative, amorphous, or fact-intensive definition than the class at issue in this case. *See Crosby v. Soc. Sec. Admin.,* 796 F.2d 576, 579–80 (1st Cir.1986) (rejecting attempt to define class as those who did not get a Social Security disability hearing or decision "within a reasonable time," because it would require case-by-case determination); *Kirkman v. North Carolina R.R. Co.,* 220 F.R.D. 49, 53 (ascertaining class members would require "detailed title searches ... across more than 300 miles of land"); *In re Copper Antitrust Litig.,* 196 F.R.D. 348, 359 (W.D.Wis.2000) (proposed definitions do not "convey[ ] sufficient meaning to enable persons hearing it to determine whether they are members of the class plaintiffs wish to represent"). Because the class in this case categorically excludes all plaintiffs who worked with a broker, and neither party has suggested that the database is systematically inaccurate, the handful of disputes that may arise over whether individuals are or are not members of the class should be fairly easy to resolve. The court finds that ascertainability concerns do not pose an obstacle to class certification.

#### I. *Time Period*

The settlements at issue in this case were entered into at different times. Some class members claims may therefore be barred by the statute of limitations. Connecticut provides for a three year statute of limitations on tort claims, including fraud, *see Conn. Gen.Stat.* § 52–577, but tolls that statute in the event of fraudulent concealment of a class of action, *see Conn. Gen.Stat.* § 52–595. Civil RICO has a four year statute of limitations, which starts to run "when the plaintiff discovers—or should reasonably have discov-

ered—the alleged injury." *McLaughlin*, 522 F.3d at 233.

For the purposes of class certification only, the court determines that the statute of limitations does not bar certification of a class from 1997 to the present, as the plaintiffs cannot be expected to reasonably have discovered the injury until it was identified by the named class members, class counsel, and plaintiffs' experts. But as with all determinations made at the class certification stage, this determination does not foreclose defendants from presenting evidence and argument at trial (or on summary judgment) that (some) class members' claims are barred by the applicable statute of limitations. *See In re IPO*, 471 F.3d at 41 (citation omitted) ("[T]he determination as to a Rule 23 requirement is made only for purposes of class certification and is not binding on the trier of facts . . . .").

## V. CONCLUSION

For the forgoing reasons, the Plaintiffs' Motion for Class Certification (**Doc. No. 121**) is GRANTED IN PART AND DENIED IN PART AS FOLLOWS:

The court DENIES CERTIFICATION on the unjust enrichment and breach of contract claims.

The court GRANTS CERTIFICATION on the fraud and RICO claims, divided into "cost" and "value" subclasses as follows:

*"Cost" Subclass:* All persons who entered into a settlement with any of The Hartford Property & Casualty Companies between 1997 and the present in which some or all of the settlement amount was to be paid as a structured settlement funded with an annuity from one of The Hartford Life Companies, who had a written contract that, or before entering into the written contract had received a written representation that, made explicit or implicit reference to the "cost" of the settlement or portion of the settlement being structured or the "cost" of an annuity being used to fund the structure. Excluded from this class are persons who were represented by a plaintiffs' broker in connection with the settlement.

*"Value" Subclass:* All persons who entered into a settlement with any of The

Hartford Property & Casualty Companies between 1997 and the present in which some or all of the settlement amount was to be paid as a structured settlement funded with an annuity from one of The Hartford Life Companies, who had a written contract that, or before entering into the written contract had received a written representation that, made explicit or implicit reference to the "value" of the settlement or portion of the settlement being structured or the "value" of an annuity being used to fund the structure. Excluded from this class are persons who were represented by a plaintiffs' broker in connection with the settlement.

**SO ORDERED.**